UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SANDRA GAYLE TUMLIN,

Plaintiff,

vs.

Case No. 2:19-cv-00457-JLB-NPM

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

**ORDER**

Plaintiff Sandra Gayle Tumlin applied for disability insurance benefits on January 15, 2018, alleging disability beginning November 24, 2016. After her application was denied originally and on reconsideration, Ms. Tumlin requested a hearing before an administrative law judge ("ALJ"), which took place in Fort Myers, Florida on January 4, 2019. By written decision dated October 8, 2019, the ALJ found Ms. Tumlin was not disabled. (Doc. 19-2.) On May 8, 2019, the Social Security Appeals Council denied Ms. Tumlin's request for review, and Ms. Tumlin subsequently filed this action seeking reversal of the Commissioner's final decision denying disability benefits. The Magistrate Judge filed a Report and Recommendation ("R&R") on September 25, 2020, recommending the Commissioner's decision be affirmed. (Doc. 32.) Ms. Tumlin filed objections to the R&R on October 9, 2020 (Doc. 33), and the Commissioner filed a response to those objections on October 22, 2020 (Doc. 34). The matter is now before the undersigned Judge.

If objections to a report and recommendation are filed, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objections are made." 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. After a careful review of the record, the Court agrees with Ms. Tumlin that the ALJ's decision is not supported by substantial evidence. Accordingly, the Court declines to adopt the R&R, and, for the reasons discussed below, reverses the decision of the Commissioner and remands the case to the Social Security Commission for further proceedings.

## BACKGROUND

### A. MEDICAL DIAGNOSES AND SYMPTOMS

At the time of her administrative hearing, Ms. Tumlin was forty-eight years old with an eighth-grade education and past work experience as a waitress and fast food worker. She was living with her boyfriend and had been unemployed since November 2016. Ms. Tumlin alleges that she is disabled due to mental health issues.[1] She suffers from depression, anxiety, panic attacks, and agoraphobia. (Doc. 19-2 at

[1] Ms. Tumlin's appeal from the Commissioner's denial of benefits raised issues related to her alleged physical limitations as well as mental limitations. But her objections before this Court challenge only the Magistrate Judge's analysis of her mental limitations. Accordingly, the Court need not address the physical limitations issues discussed in the R&R. As to those issues, the R&R's recommendations are neither accepted nor rejected, allowing for a full review of the record upon remand to the ALJ. See Demenech v. Sec'y of the Dep't of Health & Human Servs., 913 F.2d 882, 884 (11th Cir. 1990) (per curiam) (concluding that certain arguments need not be addressed when the case would be remanded on other issues).

47.) She has been diagnosed by mental health specialists with various disorders, including depression, bipolar disorder, anxiety disorder, and post-traumatic stress disorder (PTSD). (Id. at 55-56.) She takes prescription medications for these disorders, including Valium for sleep, two different doses of Lamictal for anxiety, two different doses of Wellbutrin for depression, and Abilify for bipolar disorder. (Id. at 58-59.) The medications help her "[s]omewhat, [but] not completely," and her doctors are "still changing medications around [ ] to try to get it right." (Id. at 59.) Ms. Tumlin sees her therapist once a week, and she sees a psychiatric nurse practitioner for prescription management once a month. (Id. at 65.)

At the hearing before the ALJ, Ms. Tumlin testified to extreme difficulty staying focused or concentrating, such that she could not read more than one page of a book without "zon[ing] out where [she] [is] just staring straight forward for no reason." (Id. at 57.) She had not "driven [a car] in over a year" because she "space[d] out" when she was behind the wheel" (id. at 60), and she could not watch a thirty-minute television show because she could not stay focused that long (id. at 62-63). She testified to keeping a chart on her refrigerator to keep track of certain daily tasks she otherwise would forget to do, like taking a shower, doing laundry, and reading one page of a book per day. (Id. at 60-61.)

Ms. Tumlin testified that, as a result of "[e]xtreme[ ]" abuse and trauma she experienced in her past, she had "memories or flashbacks" on a daily basis. (Id. at 62.) She testified to having crying spells at least every other day "for no reason," and panic attacks lasting up to thirty minutes three times or more per week. (Id. at

60-63.) She described the panic attacks as "hyperventilating," and feeling like she could not breath, "like something is choking [her]" and she starts "shaking." (Id. at 60.) She suffers anxiety from being around other people even if she is at home and the other people are friends or relatives just visiting for short periods of time. (Id.)

Ms. Tumlin testified that she was fired from her last job as a waitress in November 2016 for having too many panic attacks while on the job. (Id. at 61-62.) Since then, she never wants to leave the house because she avoids being around people by simply staying home. (Id. at 60, 63-64.) She testified that it has been over two years since she has gone anywhere by herself, and that, even with her boyfriend by her side, she has left the house only to go to doctor's appointments and to "grocery shop after midnight." (Id. at 64.) She does not believe she could work another job as a server because "the panic attacks just come out of [sic] no reason. Sometimes they come out of memories or thoughts that are going through my head. . . . [T]he therapist said that that was normal." (Id. at 64-65.)

### B. MEDICAL RECORDS

Ms. Tumlin's medical records show that she has been in individual therapy on a weekly basis since at least November 2017. An assessment on November 21, 2017,[2] indicates that Ms. Tumlin reported a history of diagnosed anxiety and depression

[2] The assessment was taken by Shantell Pepe of Crossroads Behavioral Center. Ms. Pepe also prepared the progress mental health notes from this time period. Ms. Pepe's name appears without any title, but the Court infers from the records that she was Ms. Tumlin's treating therapist at the time.

dating back several years; that she received out-patient mental health therapy from January 2017 through May 2017 when she lived in Georgia; that she has a past history of rape and physical and emotional abuse by an ex-husband; and that she has no memory prior to the age of twelve (which later medical records indicate is the age when the rape occurred).  (Doc. 19-8 at 58-59 (Ex. 4F/17-18).)  The report indicates past diagnoses of major depressive disorder, generalized anxiety disorder, and PTSD. (Id.)

A week later, Ms. Tumlin saw a psychiatric nurse practitioner (Max Belot, ARNP), who reported that she appeared anxious but otherwise normal.  (Id. at 55 (Ex. 4F/14).)   During the session, they discussed Ms. Tumlin's symptoms of depression, mania, generalized anxiety, obsessive-compulsive disorder, PTSD, and specific phobias (crowds and claustrophobia).  (Id.)

On December 1, 2017, a progress mental health note indicates that Ms. Tumlin "was tearful and observed to have a somber mood," and that she "was unable to articulate the reason for her sadness." (Id. at 54 (Ex. 4F/13).)   A medication management report from an appointment with Nurse Belot on December 11, 2017, diagnoses Ms. Tumlin with major depressive disorder (recurrent and moderate); generalized anxiety disorder, and PTSD.  (Id. at 51 (Ex. 4F/10).)  On December 20, 2017, a progress mental health note reports that Ms. Tumlin presented with an affect/mood that was "typical … for this patient." (Id. at 49 (Ex. 4F/8).)  She reported physical violence from her first husband that occurred when she was approximately

15-20 years old, and that one of the encounters was "particularly brutal and [Ms. Tumlin] reports almost dying." (Id.)

On January 5, 2018, Ms. Tumlin reported to her therapist that she had applied for two jobs but was "anxious about the idea of meeting new people." (Id. at 48 (Ex. 4F/7).) On January 16, 2018, Nurse Belot described Ms. Tumlin's affect as "appropriate[ ]," her mood as "euthymic," her speech as "normal," and her insight and judgment as "intact." (Id. at 46 (Ex. 4F/5).) However, the same report also states that "[t]he patient has major stress of medical illness in last 2 years"; that she is diagnosed with major depressive disorder, generalized anxiety disorder, and PTSD; that she takes at least four medications with consideration being given for a fifth; and that her "clinical status" showed "[n]o improvement." (Id. at 47 (Ex. 4F/6).)

On February 9, 2018, Ms. Tumlin's mental health progress report states that her affect and mood were "typical ... for this patient"; she "presents in a cheerful happy mood"; she reports "spending time writing poetry, knitting, and taking walks; while she admits to periodic instances of irritability," she "has been using a punching bag to help with such anxiety"; and "she continues to have difficulty with focus and attention which prevents her from reading books." (Id. at 45 (Ex. 4F/4).) The therapist saw "[s]ignificant improvement," thought that "[s]ome progress [was] apparent, and that Ms. Tumlin was "[m]aintaining past gains/stable." (Id.) Mental health progress reports from two and four weeks later (February 23, 2018 and March 2, 2018) are similar, except that they note Ms. Tumlin was informed that "her therapy

[with that therapist] would come to an end after March 9th," and she had anxiety about having a new therapist. (Id. at 43-44 (Ex. 4F/2-3).)

Ms. Tumlin transitioned to a new treatment center in March 2018. In a mental health assessment on approximately April 4, 2018, Ms. Tumlin reported depression, anxiety, and PTSD. (Doc. 9-11 at 43 (Ex. 13F/42).)[3] Her current symptoms included "being anxious in the context of being overwhelmed, excessively worried, poor concentration, sleep disturbance, irritable, and racing thoughts." (Id.) She reported physical symptoms, including nervousness, difficulty concentrating, and muscle tension. (Id.) She reported a history of "limited-symptoms panic attacks" and "recall[ed] one significant unprovoked panic attack, lasting approximately 5 minutes where she feels she is shocking [sic]." Id. at 42 (Ex. 13F/41).) Her symptoms had been present for several years ago, but had worsened in the last two months. (Id.) She felt the medications were not working. (Id.) "[A]dditionally [she] expresse[d] feeling low in energy, decreased interest in activities, guilt, worthlessness, hopelessness, and difficulty sleeping." (Id.) Ms. Tumlin reported that her symptoms started "with depressive disorder since she was 14 and started drinking alcohol. When she was 15, she got married and for 5 years was sexually, emotionally, and physically abused. Currently she is experiencing vivid dreams and having flashbacks

[3] It is difficult to discern from the way the medical notes were kept which medical practitioner from Ms. Tumlin's new therapy center made which comments in the notes. But they were those of either Ms. Tumlin's treating psychiatric nurse practitioner, Garbriel Rivera Torres, or her treating therapist, Jeri Hosick.

about those past events." (Id.)

Two weeks later, April 18, 2018, Ms. Tumlin reported improved depression, but worsening anxiety, frequent irritability, and "paranoia, evidenced by the idea of somebody watching her back." (Id. at 37 (Ex. 13F/36).)  Ms. Tumlin was reported as being "comfortable speaking, [and] social communication [was] adequate." (Id.)  Her listed diagnoses included major depressive disorder, chronic alcoholism in remission, chronic post-traumatic stress disorder, and panic disorder. (Id. at 36 (Ex. 13F/35).) Her mental status exam on this date indicates: "Intelligence: average.   Mood: **irritable**." (Id. at 38 (Ex. 13F/37).)

On June 11, 2018, Ms. Tumlin reported that, since the last assessment, she had continuing depression, "worsening in the anxiety episodes, excessive worry, restless, poor concentration, overwhelmed, try [sic] to avoid people since she starts feeling bad.  [She] report[ed] frequently irritable and mood change . . . [and] history of paranoia, evidenced by the idea of somebody watching her back."  (Id. at 32 (Ex. 13F/31).)  During the assessment, it was noted that she "was comfortable speaking, [and her] social communication [was] adequate." (Id.)  Her mental status exam on this date indicates:  "Behavior: **guarded**.   Speech: **pressured**. Perception: **Paranoia**. Intelligence: average. Mood: **sad** and **irritable**. Affect: **constricted**." (Id. at 33 (Ex. 13F/32).)

On July 9, 2018, Ms. Tumlin reported that her medications were not working. (Id. at 27 (Ex. 13F/26).)  She reported that she was still depressed, and her anxiety episodes were worsening.  (Id.)   She reported "excessive worry, restless, poor

concentration, overwhelmed, try[ing] to avoid people since she starts feeling bad[,] frequently irritable and mood change to the point that she prefers being away from people." (Id.) There does not appear to be any mental status exam for this date.

On August 6, 2018, Ms. Tumlin reported that the medications were more effective and that she noticed some improvement in her depression. (Id. at 22 (Ex. 13F/21).) However, she continued to report "symptoms of anxiety episodes, excessive worry," and she "present[ed] excessive worry, restless, poor concentration, overwhelmed, try to avoid people since she starts feeling bad." (Id.) Again, there does not appear to be any mental status exam for this date.

Two additional medical reports for later sessions (September 10, 2018, October 1, 2018) with either the therapist or the nurse practitioner are similar to the above. Ms. Tumlin reported at one of those sessions that "she does not trust anybody because 'most people are not good persons.'" (Id. at 18 (Ex. 13F/17).) At another, she reported "feeling better but at times she feels hyper and all over the place." (Id. at 13 (Ex. 13F/12).) She did not think the medications were being fully effective; she was still experiencing depression, but not as severe as before; she was still having anxiety episodes but reduced in frequency; and she had not experienced episodes of paranoia during the last three weeks. (Id. at 13-14 (Ex. 13F/12-13).) There does not appear to be any mental status exams for these dates.

On November 21, 2018, Ms. Tumlin was seen by the psychiatric nurse "for medication management" who noted that she reported "doing well with regiment." (Id. at 8 (Ex. 13F/7).) The nurse noted that Ms. Tumlin was "alert, oriented times 3,

calm, cooperative, forthcoming with organized thinking process. . . . Speech [was] normal . . . Mood [was] entirely normal with no signs of depression or mood elevation. Affect [was] appropriate [and] . . . congruent with Mood. There were no signs of anxiety . . . [or] hallucinations." (Id.)

The last medical note in Ms. Tumlin's records is dated December 14, 2018. (Id. at 3 (Ex. 13F/2).) Ms. Tumlin had stopped taking one of her medications "due [to] non therapeutic response"; she denie[d] improvement [from] her depressed state"; and she "report[ed] paranoia." (Id. at 5 (Ex. 13F/4).) The psychiatric nurse noted that Ms. Tumlin was "alert[,] oriented to all spheres, but tearful with depressed mood and affect." (Id.)

### C. MENTAL FUNCTIONING ASSESSMENTS

The ALJ considered two medical assessments of Ms. Tumlin's mental health limitations that were part of the record.[4]

#### 1. STATE ASSESSMENT (RECONSIDERATION)

A mental functioning assessment was conducted by the state psychologist in August 2018. (Doc. 19-3 at 14 (Ex. 3A).) At this time, Ms. Tumlin reported "[e]xtreme dramatic PTSD cause [sic] depression and anxiety and concentration to be worse [sic] and will take some time to treat. [I]nsomnia is up and down[,] mental health is still

[4] The ALJ gave "little weight" (Doc. 19-2 at 31) to a third assessment—the initial assessment performed by the state examiner in June 2018—and so the Court will not discuss it.

trying to adjust [to] medication to help some of these things. Panic and anxiety more likely to happen around to[o] many people." (Id. at 15 (Ex. 3A/2).)

The assessment report found severe impairments in the following categories: (1) Depressive, Biopolar and Related Disorders, (2) Anxiety and Obsessive-Compulsive Disorders, and (3) Trauma-and Stressor-Related Disorders. (Id. at 20 (Ex. 3A/7).) The report concluded that Ms. Tumlin had "severe mental impairments . . . with limitations exacerbated by psychosocial stressors." (Id. at 21, 26 (Ex. 3A/8, 13).) The report found that Ms. Tumlin's statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone." (Id. at 22 (Ex. 3A/9).) However, the report noted the absence of "a medical opinion from any medical source." (Id.) Thus, [b]ased on the totality of evidence" before the examiner at that time, the examiner found that Ms. Tumlin was only moderately limited in her ability to perform in most categories of mental functioning—including "ability to interact appropriately with the general public," "ability to accept instructions and response appropriately to criticism from supervisors," and "ability to get along with coworkers or peers." (Id. at 25 (Ex. 3A/12).) Based on only moderate limitations, the report concludes that Ms. Tumlin was capable of performing "simple routine task[s]." (Id.)

**2. DR. HOSICK'S ASSESSMENT**

On October 4, 2018, approximately two months after the medical assessment prepared by the state psychologist, a Mental Residual Functional Capacity ("MRFC")

Assessment was completed by Dr. Jeri Hosick. (Doc. 19-10 at 31 (Ex. 11F).)[5]  The Assessment indicates that Ms. Tumlin has "**Marked**" limitations (defined as 33-48% of the time) in four categories of mental functioning.  (Id. at 31-32 (Ex. 11F/2-3).)[6]  It further indicates that Ms. Tumlin has "**Extreme**" limitations (defined as 49-64% of the time) in two other categories of mental functioning.  (Id.)[7]  Finally, the Assessment finds that Ms. Tumlin has "**Very Extreme**" limitations (defined as "65% of the time (Catastrophic and Very Severe")) in eleven categories of mental functioning.  (Id.)[8]

---

[5] The Commissioner contends the evidence does not support Ms. Tumlin's assertion that Dr. Hosick was her treating therapist, noting that there are no treatment notes from Dr. Hosick in the record.  (Doc. 28 at 21 n.11.)  The Court agrees that those notes, if they exist and were obtainable, would have been beneficial to the ALJ's review here.  Nevertheless, the record adequately demonstrates that Dr. Hosick treated Ms. Tumlin, as shown by the numerous references in the medical records to upcoming therapy sessions with Dr. Hosick (from approximately April 5, 2018 through at least December 14, 2018, one month before Ms. Tumlin's disability hearing).  (See Doc. 19-7 at 351, 375, 395, 423.)  Ms. Tumlin also testified that she saw her therapist—"Jerry"—once a week.  (Doc. 19-2 at 65.)

[6] The "marked" limitations categories included: (1) ability to understand and remember very short and simple instructions; (2) ability to carry out detailed instructions; (3) ability to work in coordination with or proximity to others without being distracted by them; and (4) ability to accept instructions and respond appropriately to criticism from supervisors.  (Doc. 19-10 at 31-32 (Ex. 11F/2-3).)

[7] The two categories of mental functioning in which Ms. Tumlin's limitations were said to be "extreme" included:  (1) ability to interact appropriately with the general public, and (2) ability to set realistic goals or make plans independently of others.  (Doc. 19-10 at 31-32 (Ex. 11F/2-3).)

[8] The eleven categories of mental functioning in which Ms. Tumlin's limitations were said to be "very extreme" included:  (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to perform activities

Dr. Hosick's Assessment also includes written comments. Dr. Hosick notes that Ms. Tumlin has been diagnosed with Bipolar II disorder, panic disorder with agoraphobia, and chronic PTSD. (Id. at 32 (Ex. 11F/3).) She opines that these mental disorders "severely impair [Ms. Tumlin's] capacity to respond appropriately emotionally and cause significant cognitive impairment," and that "[h]er panic/agoraphobia prevents her from working in a social setting." (Id.)

**D. THE ALJ'S DECISION**

The Social Security Regulations outline a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1505(a); id. § 1520(a)(4); see Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011). At the first three steps of the process, the ALJ found that Ms. Tumlin was not engaged in substantial gainful activity, and that she had one or more severe mental impairments, namely, generalized anxiety disorder, depression disorder with later diagnosed bipolar disorder. (Doc. 19-2 at 25.)[9] The ALJ found that Ms. Tumlin's

---

within a schedule, maintain regular attendance, and be punctual within customary tolerance; (5) ability to sustain an ordinary routine without special supervision; (6) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) ability to ask simple questions or request assistance; (8) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) ability to respond appropriately to changes in the work setting; (10) ability to be aware of normal hazards and take appropriate precautions; and (11) ability to travel in unfamiliar places or use public transportation. (Doc. 19-10 at 31-32 (Ex. 11F/2-3).)

[9] The ALJ did not find that Ms. Tumlin had any severe impairments in the category of Trauma-and Stressor-Related Disorders, despite documentation of her history of trauma and PTSD diagnosis going back to the earliest medical notes in the record

mental impairments, although severe and significantly limiting in her ability to do basic work activities, did not meet or equal a listed impairment. (Id. at 25-26.)

The ALJ then proceeded to assess Ms. Tumlin's residual functional capacity ("RFC") given the listed impairments and "considering all symptoms."[10] The ALJ explained that, in assessing Ms. Tumlin's RFC, he gave "little weight" to Dr. Hosick's Assessment. (Id. at 30.) According to the ALJ, the mental functioning limitations in Dr. Hosick's Assessment of "mostly marked, extreme, or very extreme" were "vastly contrasted to the relatively normal mental status examination findings throughout the record." (Id.) "Because of the[se] [so-called] overwhelming normal psychiatric findings," the ALJ gave Dr. Hosick's Assessment "little weight." (Id. at 31.) On the other hand, the ALJ gave the state agency assessment at the reconsideration level "great weight." (Id.) The ALJ found the opinions of the state psychologist in that assessment were "well supported by the above-cited medically acceptable clinical

(Doc. 19-8 at 18, 54-55 (Ex. 4F/13-14, 18)), and despite the state psychologist's recognition of a severe impairment in the Trauma-and Stressor-Related Disorders category in the August 2018 state assessment (Doc. 19-3 at 20). The ALJ found that "the additional impairments medically determined in the record to be non-severe because these either did not exist for a continuous period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertion or non-exertion functional limitations." (Doc. 19-2 at 25.)

[10] An individual's RFC is her "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments." 20 C.F.R. § 404.1520(e). In determining a claimant's RFC, the ALJ must consider all of the claimant's impairments including those that are not severe. Id.; 20 C.F.R. § 1404.1545; SSR 96-8p; see Doc. 19-2 at 25.

findings and laboratory techniques; are consistent with the medical evidence of record, both before and after consultant review[[11], and represent a careful analysis of the relationship between the identified impairments and resulting limitations." (Id.)

Based on this evaluation of the evidence, the ALJ found that Ms. Tumlin had a "moderate limitation" in three categories of mental functioning: (1) interacting with others; (2) concentrating, persisting, or maintaining pace; and (3) adapting or managing oneself. (Id. at 26-27.) The ALJ determined that these moderate limitations in mental functioning impacted Ms. Tumlin's RFC in the following manner:

> [C]laimant has the residual functional capacity to perform light work . . . except [that she is] precluded from performing complex and detailed tasks; no more than occasional interaction with supervisors and the public; and no more than occasional changes in a workplace setting.

(Id. at 27.) This RFC finding meant that Ms. Tumlin could not perform her past relevant work as a waitress or sales clerk. (Id. at 32.) Based on the testimony of a Vocational Expert ("VE"), however, the ALJ found that Ms. Tumlin's RFC permitted her to perform the requirements of at least two other jobs in the economy (housekeeper and courier), and that she thus was not disabled. (Id. at 33.)

**STANDARD OF REVIEW**

Judicial review of the Commissioner's final decision as to disability is limited.

[11] The ALJ's reference to "consultant review" appears to be a reference to the state psychologist who performed the assessment. The state assessment, however, was a medical records review, and therefore, technically, was not a "consultant review."

The Court must determine only whether there is substantial evidence to support the factual findings of the Commissioner, and whether the correct legal standards were applied.  Biestek v. Berryhill, 139 S. Ct. 1148, 1152 (2019) ("The agency's factual findings on that score are 'conclusive' in judicial review of the benefits decision so long as they are supported by 'substantial evidence.'" (quoting 42 U.S.C. § 405(g)); Lacina v. Comm'r, Soc. Sec. Admin., 606 F. App'x 520, 525 (11th Cir. 2015) (per curiam) (citing Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)).  "Within this narrowly subscribed role, however, [courts] do not act as automatons."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).  Instead, the court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  Id.  If the Commissioner's decision is supported by substantial evidence, the court must affirm even if the proof predominates against it.  Dyer, 395 F.3d at 1210.  But if the ALJ "fail[s] to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted," the court must reverse.  Keeton v. Dep't of Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

## DISCUSSION

Ms. Tumlin contends that she is disabled because of mental impairments consisting of daily panic attacks, anxiety, flashbacks due to past trauma, extreme difficulty holding attention for even short of periods of time, and severe difficulty in leaving her home.  (Doc. 19-7 at 266 (Ex. 22E).)  She objects to the R&R on the ground

that the Magistrate Judge should have found that the ALJ's RFC finding as to her mental limitations is not supported by substantial evidence.

## I.   IMPROPER CHARACTERIZATIONS OF MS. TUMLIN'S ARGUMENTS

In its brief, the Commissioner (Doc. 34 at 2) mischaracterizes Ms. Tumlin's arguments for why the ALJ's assessment of her mental limitations should be reversed.  He attempts to frame her argument primarily as presenting a question as to the proper legal standards to be applied to medical opinion evidence, when in fact Ms. Tumlin is presenting a straightforward sufficiency of the evidence argument.

The Commissioner argues that Ms. Tumlin's substantial evidence argument fails because the new Social Security regulations applicable to Ms. Tumlin's application for benefits no longer require special deference to treating physicians. (Doc. 28 at 16–21; see also Doc. 34 at 2 ("Plaintiff does not demonstrate that the ALJ's decision did not comport with the new regulations.").)  The new rules "significantly alter how the agency considers medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017."  (Doc. 28 at 17.)  The primary change is that the new regulations eliminate the "treating source rule," which required deference to treating source opinion evidence.  The Commissioner will no longer give deference or any specific evidentiary weight to any medical opinions, including those from the claimant's own medical sources.  See 20 C.F.R. § 404.1520c(a).

The revised regulations became effective on March 27, 2017 and are applicable to claims filed on or after that date.  See id., § 404.1520c.  They provide that the

Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from your medical sources." Id., § 404.1520c(a). Instead, the Commissioner will consider each medical opinion using five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship and examining relationship); (4) specialization, and (5) other factors tending to support or contradict a medical opinion. Id., §§ 404.1520c(a), (c)(1)–(5). The most important factors for evaluating the persuasiveness of medical opinions are supportability and consistency. Id., §§ 404.1520c(a), 404.1520c(b)(2). The ALJ must articulate in his decision how "[he] find[s] all of the medical opinions … in [the] case record." Id., § 404.1520(b). The ALJ is only required, however, to explain how he considered the supportability and consistency factors; he may, but is not required to, explain how he considered the other three factors. Id., § 404.1520c(b)(2).

The Commissioner argues that Ms. Tumlin fails to address whether the ALJ's findings can be upheld under the new "supportability and consistency" principles.[12] But Ms. Tumlin's objections to the R&R do not "acknowledge" (Doc. 34 at 3) the new regulations because they are not directly relevant to her argument. Ms. Tumlin explains her argument as follows:

---

[12] The ALJ decision itself does not reference the new analytical framework and, from its terminology, appears to apply the old framework by according specific "weight" to medical opinions in the record.

> The RFC and hypothetical questions to the VE did not properly reflect Plaintiff's mental impairments given that Ms. Pepe, ARNP Belot, and NP Rivera Torres reported dire symptoms from her mental impairments and Dr. Hosick opined as to very extreme, extreme, and marked limitations in her abilities to perform basic work functions.

(Doc. 33 at 1 (quoting Doc. 28 at 10).) This argument does not invoke the standard to be applied by the Commission to medical opinion evidence, nor does it attempt to apply the treating physician rule. Instead, Ms. Tumlin simply argues that the ALJ's findings are not supported by substantial evidence because Dr. Hosick's assessment and medical opinion are consistent, not inconsistent as the ALJ found, with the other medical evidence in the record and support her reported symptoms, which, if properly taken into consideration, would result in an RFC with more severe limitations than the "moderate" limitations finding of the ALJ.

## II. THE ALJ'S SUBSTANTIAL EVIDENCE FINDINGS

The issue raised by Ms. Tumlin before this Court is whether the ALJ's reasons for giving Dr. Hosick's Assessment "little weight"—that the conclusions in her Assessment regarding Ms. Tumlin's mental functioning were "vastly contrasted to" the "relatively normal mental status examination findings throughout the record" and/or the "overwhelming normal psychiatric findings" in Ms. Tumlin's medical records—is supported by substantial evidence. As discussed below, the Court finds that it is not, and therefore that the ALJ's decision must be reversed for further development of the record.

**A. "Normal Psychiatric Evaluations"**

The ALJ makes multiple references to "normal psychiatric evaluations" in Ms. Tumlin's medical records. The ALJ cites two medical records in this regard.

The first is a record from Ms. Tumlin's primary care physician in Georgia. According to this record, Ms. Tumlin saw her doctor for an upper respiratory infection, and that doctor observed that her mental status appeared normal during the visit. (Doc. 19-8 at 1–2 (Ex. 1F/2.) The physician visit in question occurred before the alleged November 24, 2016 onset date. More importantly, the ALJ's repeated statement that this medical report shows that Ms. Tumlin "was seen with normal psychiatric findings" (e.g. Doc. 19-2 at 26; id. at 28( twice); id. at 30 (twice)) is simply wrong. This was not a psychiatric evaluation of a mental health professional and therefore does not contain "psychiatric findings" of any kind. In fact, the portion of the medical record that the ALJ references is a "review of systems" by a primary care physician rather than a mental health specialist's mental health review; at most, it amounts to another mental status report (discussed in the next section).[13]

The second citation for "normal psychiatric findings" the ALJ provides is to a medical record from November 28, 2017. Nurse Practitioner Belot observed that

[13] During her first psychiatric evaluation in Florida, Ms. Tumlin reported she had a history of trauma and that she received out-patient mental health therapy from January 2017 to May 2017 while living in Georgia. (Doc. 19-8 at 58-59 (4F/17-18).) Nothing about the medical report from Ms. Tumlin's primary care physician in Georgia contradicts this history or otherwise supports a finding that Ms. Tumlin had "normal psychiatric evaluations" while she lived in Georgia. Again, the office visit to her primary care physician was to treat an upper respiratory infection.

Ms. Tumlin presented as cooperative, polite, pleasant and calm at that evaluation, and that her mental status at the time appeared good. (Doc. 19-8 at 55–56 (Ex. 4F/14–15).). The ALJ cites this mental status evaluation as a report of "entirely normal psychiatric findings." (Doc. 19-2 at 28.) The same medical record, however, also reported that Ms. Tumlin was being treated for depression, anxiety, racing thoughts, feeling of hopelessness; that she was physically abused in past marriages, that she had mental health problems in multiples areas (Depression: sleep, energy and concentration; Mania: irritability, need less sleep; elevated mood and speedy thoughts; Generalized Anxiety: excess worry, restless/edgy and easily fatigued; PTSD: experienced/witness event and avoidance behavior; Specific Phobias: crowds and claustrophobia). In other words, in no way can the mental status evaluation from the report in question be read as a report of "entirely normal psychiatric findings." To the contrary, Nurse Practitioner Belot diagnosed Ms. Tumlin in the report with an "unspecified mood disorder" and prescribed a treatment plan that included the prescription drugs Wellbutrin, Lamictal, and Vistatil.

**B. "NORMAL MENTAL STATUS EXAMINATIONS"**

The primary evidence cited by the ALJ for his finding that Dr. Hosick's Assessment was inconsistent with Ms. Tumlin's medical records are a few "mental status examinations" in those records that purportedly show Ms. Tumlin's mental state to be "normal." (See Doc. 19-2 at 28 (citing Ex. 4F/14, 15 ).) For instance, referring to the notes of the treating psychiatric nurse, the ALJ states that "the claimant was reported with mood that is entirely normal with no signs of depression

or mood elevation. Her affect was observed congruent with mood and intact associations, logical thinking, appropriate thought, intact cognitive functioning, an intact fund of knowledge." (Doc. 19-2 at 28.)[14] In recommending that the Court uphold the ALJ's RFC finding, the R&R cites to the ALJ's reliance on the mental status examinations,[15] and then tersely concludes that "it is not the Court's job to reweigh the evidence or decide facts anew." (Doc. 32 at 9.) That is indeed true but, as will be explained, this Court is not reweighing the record evidence by examining that evidence to discern if the ALJ inaccurately characterizes the evidence on which it relies for its RFC finding.

### 1. CHERRY-PICKING

An "ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding." Dicks v. Colvin, No. 3:15-cv-934, 2016 WL 4927637, at *4 (M.D. Fla. Sept. 16, 2016) (citation omitted); see, e.g., Bates v. Colvin, 736 F.3d

---

[14] See also Doc. 19-2 at 29 ("The claimant was observed on mental status examination to be alert and oriented, cooperative, well-related, mood sad with congruent affect, mood (normal) anxious, and logical thought."); id. ("the claimant was observed comfortable speaking and adequate social communication . . . alert, oriented, calm, cooperative, forthcoming, organized thinking, casually groomed, relaxed, normal speech, coherent, entirely normal mood with no signs of depression or mood elevation, appropriate affect, congruent mood, and no signs of anxiety").

[15] Ms. Tumlin asserts that the Magistrate Judge "does not address" the issue of whether substantial evidence supported the RFC." (Doc. 33 at 2.) That is not true, although it is accurate to the extent that the R&R's discussion is fairly conclusory and consists of only a few sentences finding that the mental status examinations constituted substantial evidence for the ALJ's RFC.

1093, 1099 (7th Cir. 2013) ("while an ALJ need not mention every piece of evidence in [his] opinion, [he] cannot ignore a line of evidence that suggests a disability").  In such instances, like here, the Court cannot properly find whether substantial evidence supports the ALJ's decision.  See McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986) ("It is not enough to discover a piece of evidence which supports that decision, but to disregard other contrary evidence.  The review must take into account and evaluate the record as a whole.").

Indeed, an "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419 (7th Cir. 2010).  "Only then can we be sure that the final determination reflects the ALJ's assessment of all of the evidence in the record."  Baldwin v. Berryhill, 746 F. App'x 580, 583 (7th Cir. 2018) (reversing ALJ's determination that claimant was not disabled and stating: "This record, unfortunately, reveals that the ALJ cherry-picked the evidence in determining that Baldwin's condition improved after May 15, 2014.").

"'Cherry picking' can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." Younes v. Colvin, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. 2015).  Here it is both.  The ALJ does not comply with the requirement that all evidence be taken into account because he merely cites a few positive mental status examinations without giving any indication that he considered the numerous other mental status

examinations, diagnoses, and documented symptoms in the record that showed severe mental health issues. The ALJ is not required to specifically refer to every piece of evidence in his decision. See Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). The ALJ is required, however, to consider all the presented evidence in making his findings and the ultimate disability determination, and a reviewing court should have some indication in the decision that he did so. See Meek v. Astrue, No. 3:08-cv-317, 2008 WL 4328227, at *1 (M.D. Fla. Sept. 17, 2008) ("Although an ALJ need not discuss all of the evidence in the record, he many not ignore evidence that does not support his decision. . . . Rather, the judge must explain why significant probative evidence has been rejected."); see also Santi v. Comm'r of the Soc. Sec. Admin., No. 6:18-cv-1574, 2020 WL 1527853, at * 6 (M.D. Fla. Mar. 31, 2020). This is especially important because while the Court may not reweigh the evidence, it "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).

What is more, the ALJ even misreads what ostensibly "normal" mental status examinations that he cherry-picked to justify his RFC determination. That is, the very same records that show so-called normal mental status examinations also show that the treating provider found Ms. Tumlin to have serious mental disorders and significant symptoms of those mental disorders. For instance, the ALJ takes note of Ms. Tumlin's visit with the nurse practitioner on November 21, 2018, because it occurred shortly after Dr. Hosick prepared her Assessment and opinion. (Doc. 19-2 at 31 (citing Ex. 12F/3).) Yet, despite noting that Ms. Tumlin was alert, oriented,

calm, and cooperative, with normal mood and no signs of depression, the very same page of the November 21, 2018 medical report has a heading "Mental Status Exam" under which there are listed <u>over ninety</u> symptoms Ms. Tumlin was experiencing, including specific references to agoraphobia; PTSD; "experienced/witnessed event"; "persistent re-experiencing"; dreams/flashbacks; fear of meeting unfamiliar people' and phobias of crowds, animals, insects, and the natural environment, as follows:

Center for Progress and Excellence
Psychiatric Clinical Note
Location: Labelle Office
Start Time:1:45 pm
End Time: 2:15 pm
Total Time:

Mental Status Exam

| | | |
|---|---|---|
| Depression/SIGECAPS | Mania/Giddiness | Psychosis |
| Low mood for >2 weeks | Grandiose | Hallucinations/Illusions |
| Sleep | Increased activity: goal directed/high risk | Delusions |
| Interest | Decreased judgement | Self-Reference: |
| Guilt/Worthlessness | Distractible | Messages from media |
| Energy | Irritability | Thought Blocking |
| Concentration | Need Less Sleep | Disorganization: |
| Appetite/weight: | Elevated mood | Ideas of reference |
| Psychomotor slowing | Speedy talking | |
| Suicide: | Speedy thoughts | |
| Panic Attacks | Generalized Anxiety | Social Phobia |
| Trembling | Excess worry | Performance Situations |
| Palpations | Restless/edgy | Fear of eating in public |

443

| Nausea/chills | Easily fatigued | Fear of meeting unfamiliar people |
|---|---|---|
| Choking/chest pain | Muscle tension | Specific Phobias |
| Sweating | Decreased sleep | Heights |
| Fear | Decreased concentration | Crowds |
| Anticipatory anxiety | Startle | Animals |
| Avoidance | Borderline Personality | Animals |
| Agoraphobia | Fear abandonment/rejection | Insects |
| Antisocial Personality | Unstable relationships | Claustrophobia |
| Forensic history: | Chronic emptiness | Natural Environment |
| Aggressiveness/violence | Low/decreased self esteem | Obsessive Compulsive Disorder |
| Lack of empathy/remorse | Intense anger outburst | Intrusive/persistent thoughts |
| Lack of concern for safety | Self-damaging behavior | Recognized as excessive/irrational |
| Childhood conduct disorder | Labile mood and impulsivity | Repetitive behaviors: |
| PTSD | Body Dysmorphic Disorder | ADHD |
| Experienced/witnessed event | Excess concern with appearance/certain part of body | Attention problems |
| Persistent re-experiencing | Avoidance behavior | Concentration/Focus problems |
| Dreams/flashbacks | Eating Disorders | School/work performance issues |
| Avoidance behavior | Binging/purging/restriction/amenorrhea | |
| Hyper-arousal: | Perception of body image or weight | |

(Doc. 19-11 at 7–8 (Ex. 13F/6–7).) It is unclear how, or even if, the ALJ reconciled "[t]here are no signs of anxiety" with "panic attacks," "excess worry," or "avoidance behavior." (Id. at 8 (Ex. 13F/7).)

In another example, the ALJ cites a medical note stating that Ms. Tumlin reported "using a punching bag to help with instances of irritability" (Doc. 19-2 at 29), and another stating that Ms. Tumlin "reported struggling with lack of motivation (id. (citing Ex. 4F/17)). By only citing to the relatively mild symptoms of irritability and lack of motivation stated within those reports, the ALJ paints an inaccurate picture of Ms. Tumlin's symptoms. The same medical record that referred to Ms. Tumlin's reported lack of motivation also states that her "chief complaint[s]" included "hypersensitivity, low mood and low energy, difficulty falling and staying asleep, difficulty with depressive symptoms and insomnia since childhood." (Id. at 58 (Ex. 4F/17).) Additionally, it states that Ms. Tumlin reported "a history of diagnosed

anxiety and depression dating back several years"; a history of trauma, including rape and physical and emotional abuse by her first husband; and that she "has no memory prior to the age of twelve." (Id. at 59 (Ex. 4F/18).)

The ALJ makes no attempt to reconcile the conclusions he draws from one or two notations in a report indicating Ms. Tumlin presented with normal mood and affect with the immediately preceding listing of over ninety symptoms. By focusing on positive mental status examinations "without reconciling th[ose] positive findings . . . with [Ms. Tumlin's] diagnoses, ongoing treatments, and reports of continuing, possibly deteriorating symptoms[,] . . . the ALJ appears to have ignored entirely evidence that contradicts his RFC analysis without adequate explanation." Randi R. W. v. Comm'r of Soc. Sec., 421 F. Supp. 3d 616, 623 (N.D. Ind. 2019). Put simply, on this record, while it is clear what favorable evidence the ALJ relied on in formulating the RFC, the Court is otherwise left guessing as to how the ALJ considered the unfavorable evidence of record beyond the sparse citation to minimal treatment notes like "lack of motivation." It may very well be that the ALJ's RFC ultimately accounted for the unfavorable evidence but, the Court cannot make that assumption as it would require the Court to impermissibly weigh that evidence.

**2. FALSE INCONSISTENCY FINDINGS**

The ALJ's repeated emphasis on the normal mental status examinations without adequate explanation of potentially competing evidence is also concerning because normal mental status examinations do not equate to a lack of disability. The mental status examinations in Ms. Tumlin's medical records appear to be little more

than the treating provider's observations in the moment of Ms. Tumlin's mental state.[16] One can both appear normal in mood and affect and still suffer from debilitating mental health issues such as agoraphobia, depression, bipolar disorder, and PTSD. With no further explanation, the ALJ's emphasis on the mental status examinations implies a misunderstanding that normal mental status examinations preclude a finding of disability.

The ALJ used the normal mental status evaluations as his rationale for discounting Dr. Hosick's Assessment and opinion (as well as for discounting Ms. Tumlin's testimony about her limitations and symptoms[17]). Inconsistencies, if

---

[16] The Merck Manual defines a mental status examination as "an assessment of current mental capacity through evaluation of general appearance, behavior, any unusual or bizarre beliefs and perceptions (e.g. delusions, hallucinations), mood, and all aspects of cognition (e.g. attention, orientation, memory)," and describes screening tools for the assessment such as the Montreal Cognitive Assessment and the Mini-Mental State Examination." *https://www.merckmanuals.com/professional/neurologic-disorders/neurologic-examination/how-to-assess-mental-status*. The mental status examinations here do not appear to be full-blown assessments like that described in the Merck Manual as there is no indication that any formal testing or screening tool was used.

[17] Although Ms. Tumlin does not mention the ALJ's treatment of her own testimony as a basis for reversal, the Court is troubled by the ALJ's failure to mention let alone discuss Ms. Tumlin's testimony regarding her symptoms of agoraphobia and panic attacks, particularly her testimony about not having gone out of the house in the past two years without someone with her, even then only going out for doctor's appointments and at night for grocery shopping. When a claimant seeks to establish disability based on subjective testimony, she must satisfy two parts of a three-part test, showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptom]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed" symptom. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam); see also 20 C.F.R. § 404.1529(a). Once the claimant provides such testimony, the "ALJ must then articulate adequate reasoning for discrediting such

they do exist, typically would suffice as substantial evidence supporting an ALJ's failure to credit a medical opinion in crafting a claimant's RFC.[18] But here, the inconsistencies pointed out by the ALJ are not inconsistencies at all. Relatively normal mental status examinations occurred during therapy sessions when the reporting nurse practitioner or therapist also reported serious mental health issues

---

subjective testimony." Alvarez v. Comm'r, No. 20-11721, 2021 WL 777143, at *3 (11th Cir. Mar. 1, 2021) (citing Wilson, 284 F.3d at 1225)) (emphasis added). While the ALJ's "credibility determination does not need to cite particular phrases or formulations, [ ] it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the plaintiff's] medical condition as a whole." Dyer, 395 F.3d at 1210 (quotation and citation omitted). The ALJ found that Ms. Tumlin's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms; however," Ms. Tumlin's "statements concerning the intensity, persistence and limiting effects of these symptoms" were not consistent with the "medical evidence and other evidence in the record." (Doc. 19-2 at 30.) But the ALJ relied for this finding on the mental status examinations, which were not inconsistent with Ms. Tumlin's testimony for the reasons discussed. And the ALJ's reliance on Ms. Tumlin's reports in the medical records of "looking for a job, performing hobbies such as crocheting, writing, and furniture refining . . . doing household chores of cooking, cleaning, doing laundry and shopping" (id. at 30) are not inconsistent with her testimony and Dr. Hosick's medical opinion that Ms. Tumlin's mental health diagnoses severely impair her capacity to respond emotionally in an appropriate manner or engage with others in a social setting. Even more, Dr. Hosick flat out concluded that, along with her other diagnoses, Ms. Tumlin's panic/agoraphobia disorders yield her ability to function in a social setting. (Doc. 19-10 at 32 (Ex. 11F/3).) See Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("Nor do we believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability.").

[18] See Martinez v. Acting Comm'r of Soc. Sec., 660 F. App'x 787, 794 (11th Cir. 2016) (ALJ gave sufficient reasons for assigning little weight to opinions of physician because it was inconsistent with overall record); Hernandez v. Comm'r of Soc. Sec., 523 F. App'x 655, 657 (11th Cir. 2013) (ALJ provided good cause for affording little weight to opinions of social security disability claimant's treating physicians, which were inconsistent with doctors' own treatment notes and with objective medical evidence).

and the need for continued care. If those normal mental status examinations meant, as the ALJ seems to suggest they meant, that Ms. Tumlin had no or few limitations from her mental impairments, then those medical reports themselves would be internally inconsistent. At the very least, the ALJ's emphasis on normal mental status examinations exposes a gap in his logic from the evidence of the record to his cursory conclusions related to Ms. Tumlin's RFC, calling into question his RFC finding. See, e.g., Ernestine C. v. Comm'r, No. 1:18-cv-2979, 2019 WL 5410066, at *11 (N.D. Ga. Aug. 30, 2019) (that a claimant had "some normal findings 'over a long period of treatment' . . . do[es] not demonstrate that a doctor's opinions about the patient's limitations are suspect").

The mere fact that Ms. Tumlin was observed with normal affect and mood during some of her appointments does not render Dr. Hosick's Assessment and opinion any less relevant and probative for the ALJ's consideration of Ms. Tumlin's RFC. To a large degree, the Assessment relates to Ms. Tumlin's ability to function socially, and, other than noting Ms. Tumlin was "cooperative" during the examinations, none of the mental status examinations cited by the ALJ specifically address Ms. Tumlin's capacity for socialization.[19] To state it in the negative, the

[19] The R&R states that the ALJ incorporated Dr. Hosick's opinion regarding Ms. Tumlin's limitations in social interactions into the RFC because it limits Ms. Tumlin "to no more than occasional interaction with supervisors and the public." (Doc. 32 at 9.) But Dr. Hosick opines that Ms. Tumlin's mental disorders "severely impair her capacity to respond appropriately emotionally and cause significant cognitive impairment," and that "[h]er panic/agoraphobia prevents her from working in a social setting." (Doc. 19-10 at 32 (Ex. 11F/3).) A limitation on social interactions to "no more than occasional" occurrences accounts for a "moderate," not "severe"

mental status examinations do not constitute substantial evidence for thee ALJ's rejection of Dr. Hosick's opinion in formulating the RFC. See Wheat v. Berryhill, No. 17CV2496-MMA (RNB), 2018 WL 4328219, at *2 (S.D. Cal. Sept. 11, 2018) (determining that ALJ erred in relying on mental status examinations which did not undermine medical opinion and were not inconsistent with "consistently reported symptoms of severe depression, anxiety, agoraphobia, and obsessive compulsive disorder"); see also West v. Colvin, 8:14-CV-2659, 2016 WL 7508830, at *3 (M.D. Fla. Mar. 23, 2016) (reversing ALJ's determination that claimant was not mentally disabled and noting, "The plaintiff argues meritoriously that substantial evidence does not support the law judge's finding that Dr. DeVine's records show an improvement in his mental condition. . . . . In fact, the plaintiff correctly asserts that Dr. DeVine's treatment notes show a deterioration of the plaintiff's mental condition.")).

---

impairment in the area. See, e.g., Washington v. Soc. Sec. Admin., Com'r, 503 F. App'x 881, 883 (11th Cir. 2013) (finding ALJ's hypothetical took account of the plaintiff's moderate limitations in social functioning by limiting the plaintiff to jobs that involved only occasional interaction with the general public and co-workers). Moreover, such a limitation is inconsistent with Dr. Hosick's opinion that Ms. Tumlin's panic/agoraphobia prevents her from having any social interactions at all. (Doc. 19-10 at 32 (Ex. 11F/3). And had the ALJ imposed a greater than moderate limitation in social functioning on Ms. Tumlin's RFC, the result would have been different. (See Doc. 19-2 at 71 (vocational expert ("VE") testimony that, if Ms. Tumlin's RFC were further limited by the requirement that, "[o]n a sustained basis, the individual would be unable to respond appropriately to usual work situations or to deal with changes in a routine work setting," there would be no jobs in the economy).)

### 3.   EPISODIC NATURE OF PTSD AND EFFECT OF HIGHLY STRUCTURED AND SUPPORTIVE THERAPEUTIC ENVIRONMENT

There is still an additional reason why the normal mental status examinations do not provide substantial evidence for the ALJ's RFC determination.  The Eleventh Circuit has cautioned that "an ALJ's reliance solely on face-to-face observations made in highly structured and supportive environments may not constitute substantial evidence when episodic conditions like PTSD are involved."  Ross v. Commissioner, 794 F. App'x 858, 864 (11th Cir. 2019).  In Perez v. Commissioner, 625 F. App'x 408, 418 (11th Cir. 2015), the Eleventh Circuit found that a treating physician's notes that the claimant "was cooperative, had good eye contact, and had no delusions or compulsions" did not contradict the physician's ultimate conclusion concerning the claimant's inability to function in a work setting.  And, in Mace v. Commissioner, 605 F. App'x 837, 842 (11th Cir. 2015), the Commissioner's denial of benefits was remanded for further proceedings because the ALJ had failed to consider the episodic nature of the claimant's bipolar disorder and depression, or the effect of controlled environments on the claimant's ability to function.  As the Seventh Circuit has explained, "[a] person who has a chronic disease . . . and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days[.]  . . . Suppose that half the time she is well enough that she could work, and half the time

she is not. Then she could not hold down a full-time job." Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008).[20]

The record shows that Ms. Tumlin has been diagnosed with bipolar disorder, a disorder that is characterized by an "episodic nature" of "better days and worse days," along with symptom-free intervals. Mace, 605 F. App'x at 843. Ms. Tumlin also has been diagnosed with PTSD, which can cause employment difficulties because of its episodic and unpredictable nature. In Ross, the court upheld the ALJ's finding that the plaintiff was not disabled despite his PTSD, but did so only because the

[20] See also Ernestine C., 2019 WL 5410066, at *10-11 (holding that a doctor's opinion concerning the effect of a claimant's mental health disorder on her ability to "sustain gainful employment" was not inconsistent with mental status examinations showing the plaintiff "was alert and oriented and had good eye contact, normal speech," etc.); Cook v. Berryhill, No. 3:18cv-177, 2019 WL 1376516, at *5 (M.D. Fla. Mar. 27, 2019) (ALJ's finding that treatment notes were inconsistent with physician's opinion was not supported by substantial evidence where the ALJ mostly cited those portions of the treatment notes that showed the plaintiff doing well, when, a review of the record, showed that the plaintiff's condition fluctuated significantly, such that some days the plaintiff was doing better than other days); Hill v. Berryhill, 17-14262-CIV, 2018 WL 6048006, at *9 (S.D. Fla. Nov. 19, 2018) (stating that, rather than focus solely on the apparent success of therapy in easing a claimant's psychosis, the ALJ must consider whether "[a] mental health patient who is stable with therapy and support may decompensate in a more demanding setting such as in the workplace"); Cannington v. Barnhill, No. 5:16-cv-208, 2017 WL 4404569, at *8 (N.D. Fla. Sept. 29, 2017) (explaining that "the point made in Mace was that the ALJ needs to consider the mercurial, unpredictable nature of an impairment such as [ ] its possible effects on the claimant's ability to work," and that, "[s]een in this light, the fact that [a] [p]aintiff may have appeared cogent and unaffected during his medical interviews, for instance, carries less weight than normal"); Limle v. Berryhill, No. 8:17-cv-273, 2017 WL 6756606, at *6 (M.D. Fla. Dec. 12, 2017), report and recommendation adopted sub nom. Limle v. Comm'r, 2017 WL 6610786 (M.D. Fla. Dec. 27, 2017) (holding that, where the ALJ overemphasized the plaintiff's good days without regard for her bad days, the ALJ's consideration of the plaintiff's mental impairments in fashioning her RFC is not supported by substantial evidence).

mental status examinations on which the ALJ relied "very clearly took into account more than the simple fact that [the plaintiff] was functioning normally during the session." 794 F. App'x at 864 (emphasis added). Instead, the medical notes, as well as the plaintiff's own self-reports, showed that the plaintiff "was able to function adequately even in activities outside of controlled environments, including stressful environments like court proceedings and late night visits from child protective service agents." Id. at 864 n.8.

Here, there is no similar assessment of Ms. Tumlin's ability to function outside of her therapist's office in the record. The ALJ cites to (1) a medical report in November 2017 which indicates that Ms. Tumlin "reported enjoying woodworking, crocheting, and writing poetry and short stories"; (2) a medical report in December 2017, which indicates that Ms. Tumlin "reported doing well on medication'; and (3) a medical report in January 2018, which indicates that Ms. Tumlin "reported applying for two jobs." (Doc. 19-2 at 29-30 (citing Ex. 4F/18; Ex. 4F/9 and Ex. 4F/7).) Without a more robust discussion from the ALJ, however, these self-reported activities cannot constitute substantial evidence for an "occasional interaction" limitation, as stated in the RFC, in light of Dr. Hosick's medical opinion to the contrary. See, e.g., Booker v. Comm'r, No. 6:16-CV-2247-ORL-TBS, 2017 WL 6380422, at *6 (M.D. Fla. Dec. 14, 2017) (rejecting ALJ's finding of "inconsistency between 'claimant's self-reported activities of daily living such as cleaning or providing care for her grandmother' and disabling mental limitations due to PTSD and MDD").

Simply stated, the record is devoid of substantial support for the ALJ's conclusion that the cherry-picked and misread mental status evaluations are inconsistent with Dr. Hosick's Assessment. Neither the mental status evaluations nor Ms. Tumlin's own self-reports contain information that shows Ms. Tumlin is able to function socially or in a work environment at a higher level than reported by Dr. Hosick. That Ms. Tumlin appeared mentally stable during a few of her monthly thirty-minute sessions with the psychiatric nurse is not evidence to conclude that she could perform equally and consistently each day during a 40-hour work week. At a minimum, it certainly is not "substantial" evidence. In sum, the record needs further development to discern whether the ALJ considered other evidence, which he deemed substantial, besides the above-discussed treatment notes in formulating Ms. Tumlin's RFC.

**C. STATE PSYCHOLOGICAL ASSESSMENT**

Finally, the ALJ gave "great weight" to the opinion of the state agency psychologist at the reconsideration level on July 20, 2018. (Doc. 19-2 at 31.) In assessing Ms. Tumlin's mental health impairments, the state psychologist never examined Ms. Tumlin directly. Instead, his opinion was based on Ms. Tumlin's own statements and medical treatment notes. (Doc. 19-3 at 14–20 (Ex. 3A/1–7).) The ALJ found the state psychologist's opinion "well supported by the [ ] medically acceptable clinical findings and laboratory techniques" (Doc. 19-2 at 31), while simultaneously giving "little weight" to Dr. Hosick's Assessment on October 4, 2018 (id. at 30)—some two months after the state psychologist's opinion.

Dr. Hosick's Assessment finding mostly marked, extreme, or very extreme limits is in contrast to the state assessment, which found mostly moderate limitations. But it appears from the state assessment itself that the state psychologist understood that his findings were limited by the absence of information in the record. The state psychologist actually opines that a consultative examination from one of Ms. Tumlin's medical providers was appropriate because "additional evidence needed is not contained in the records of [Ms. Tumlin's] medical sources." (Doc. 19-3 at 19 (Ex. 3A/6.)[21] Dr. Hosick provided that assessment on October 4,

[21] The state assessment answers "yes" to the question "[i]s a [consultative examination] required?" (Doc. 19-3 at 19 DA/6.) It explains one was needed because "[t]he additional evidence needed is not contained in the records of the individual's medical sources." Id. The state assessment then answers "yes" to the question "was the individual's medical source[s] contacted to perform the [consultative exam]?" (Id.) While the state assessment represents that Ms. Tumlin's medical source was contacted to perform the consultative examination, it also states that "[t]he individual has no medical source to perform the CE." (Id.) The initial state assessment said something similar: "[t]he individual's medical source(s) is unqualified to perform the CE(s)." (Doc. 19-3 at 5 (Ex. 1A/4).) There is a dispute in the parties' briefing as to whether the ALJ may have discounted Dr. Hosick's Assessment because he believed she was unqualified. (See Doc. 28 at 12.) The ALJ's decision does not give that as the reason for giving little weight to Dr. Hosick's opinions, and the Court must rely on the written decision in determining whether the ruling was in error. But the Court can understand why Ms. Tumlin may have thought that was a possibility, given the statements in the state assessments. As best the Court can tell, the state assessments' comments may refer to the fact that Dr. Hosick, as a Licensed Mental Health Counselor, would not have qualified under the old regulations as an "acceptable medical source." See Farnsworth v. Soc. Sec. Admin., 636 F. App'x 776, 783–84 (11th Cir. 2016) (citing SSR 06–03p, 2006 WL 2329939, at *1–2 (Aug. 9, 2006) (explaining that "acceptable medical sources" do not include Licensed Mental Health Counselors); see also 20 C.F.R. § 404.1527(a)(1) (defining a "medical opinion" as a statement from an "acceptable medical source[ ]," and then describing procedure for determining how much weight will be given to those medical opinions). In fact, however, since the new regulations took effect, it appears Dr. Hosick would qualify to

2018.[22] Yet the ALJ did not ask the state psychologist to revisit his assessment in light of Dr. Hosick's subsequent Assessment. Had the ALJ ordered its own consultative examination resulting in an opinion that conflicted with Dr. Hosick's findings, then substantial evidence might have supported the ALJ's RFC determination as to Ms. Tumlin's mental impairments. This is crucial in light of the fact that both the state psychologist and Dr. Hosick found that Ms. Tumlin had severe mental impairments; they only differed in their assessment as to the limitations of those impairments. (Compare Doc. 19-3 at 26 (Ex. 3A/13) with Doc. 19-10 at 32 (Ex. 11F/3).) The ALJ gave great weight to the opinion of the state psychologist when that psychologist gave her opinion based on medical evidence in the record only through July 9, 2018. (Doc. 19-3 at 16 (Ex. 3A/6).) The ALJ did so despite the state psychologist explaining that a consultative examination from one of Ms. Tumlin's medical providers was appropriate because "additional evidence needed is not contained in the records of [Ms. Tumlin's] medical sources." (Doc. 19-3 at 19.) The Court finds this most troubling. The state assessment itself reports Ms. Tumlin's symptoms as worsening in June 2018 (id. at 21), and indicates that there was no

perform a consultative examination and to provide a medical opinion as part of that assessment. See infra n. 22.

[22] Dr. Hosick, as a licensed mental health counselor, can provide a medical opinion under the current regulations, even though she is not a licensed psychologist or medical doctor. See 20 C.F.R. § 404.1513(2) (defining a "medical opinion" as a statement from "a[ny] medical source"); id. § 404.1520c (setting forth new rules for how all medical opinions are to be evaluated).

medical opinion from any medical source for the assessment to take into consideration (id. at 26).   Dr. Hosick's medical opinion provides the very thing that the state assessment notes is absent.[23]

It is well settled that an ALJ cannot rely on a file-review opinion if post-review developments reflect a significant worsening of the claimant's condition because such an opinion does not amount to substantial evidence.   Stacey S. v. Berryhill, C.A., No. 18-00284-JJM, 2019 WL 2511490, at *7 (D.R.I. June 18, 2019) (opinion is not stale unless there is a "sustained (and material) worsening" of the claimant's impairments); Virgen C. v. Berryhill, C.A., No. 16-480 WES, 2018 WL 4693954, at *3 (D.R.I. Sept. 30, 2018) ("[I]f a state-agency physician reviews only a partial record, her 'opinion cannot provide substantial evidence to support [an] ALJ's residual functional capacity assessment if later evidence supports the claimant's limitations.'") (second alteration in original) (citation omitted).   Here, the file-review opinion itself recognizes the beginning of worsening symptoms and requests further information.   Again, the state assessment itself recognizes that its conclusions were

---

[23] The R&R gets bogged down in a discussion of how much of Dr. Hosick's Assessment constitutes "medical opinion" evidence, 20 C.F.R. § 404.1513(a)(2)(ii), and how much constitutes "other medical evidence," id., § 404.1513(a)(3).   (See Doc. 32 at 8.)   The Court agrees that likely only the last few comments at the end of Dr. Hosick's Assessment qualifies as "medical opinion."   But the remainder of the Assessment is on the same footing as the state psychologist's assessment, which mostly also falls into the "other medical evidence" category, and there is no reason to think that the distinction drawn in the R&R had anything to do with the ALJ's decision to give the state psychologist's assessment greater weight than Dr. Hosick's Assessment.

subject to change and would benefit from a consultative medical opinion and assessment of a treating medical provider.

The failure of the ALJ to obtain a state consultative examination or else recognize Dr. Hosick's opinion as qualifying the state psychologist's findings "would not necessarily be fatal considering the ALJ had the records before him when making his decision, if it was obvious the judge had considered all the evidence of record." Zellner v. Astrue, No. 308-cv-1205, 2010 WL 1258137, at *7–8 (M.D. Fla. Mar. 29, 2010). However, as discussed supra, the ALJ failed to demonstrate that he properly considered all the evidence. See id. (reversing and remanding on this basis).

The ALJ took it upon himself to determine whether the findings of mostly moderate limitations in the state psychological assessment should be reconsidered in light of Dr. Hosick's assessment. The ALJ states:

> The opinions, supplied by a consultant with expert knowledge of the SSA disability assessment program rules and criteria, are well supported by the above-cited medically acceptable clinical findings and laboratory technique; are consistent with the medical evidence of record, both before and after consultant review . . . .

(Doc. 19-2 at 31 (emphasis added).) Assuming the "consultant review" to which the ALJ is referring is the state assessment in August 2018, the ALJ made his own finding of the relevance to that assessment's conclusions of medical evidence not part of the record at the time the assessment took place. That finding is in error. See Marbury v. Sullivan, 957 F.2d 837, 840 (11th Cir. 1992) (Johnson, J. concurring) (stating that the ALJ "abuse[d] his discretion when he substitute[d] his own

uninformed medical evaluations for those of" the claimant's doctor); Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) (stating that, an ALJ "may not simply draw his own inferences about plaintiff's functional ability from medical reports").

The Court notes that the ALJ had a duty to develop a full and fair record, where, as here, the need for a consultative examination of Ms. Tumlin was readily apparent for the ALJ to make an informed decision. See Holladay v. Bowen, 848 F.2d 1206, 1209–10 (11th Cir. 1988) ("it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision"). An ALJ may rely on a consultative examination when trying to resolve "an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision." 20 C.F.R. § 416.919a(b). But the ALJ is not required to order such an examination "as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." Ingram v. Comm'r, 496 F.3d 1253, 1269 (11th Cir. 2007). Ultimately, "[i]n determining whether it is necessary to remand a case for development of the record, this Court considers 'whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" Salazar v. Comm'r, 372 F. App'x 64, 67 (11th Cir. 2010) (quoting Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995)). Here, the Court finds the ALJ should not have given the state assessment from August 2018 great weight while discounting as entitled to little weight Dr. Hosick's later assessment in October 2018 without either ordering a consultative examination or asking the state psychologist to revisit his August 2018 assessment to take into account Dr. Hosick's

assessment and subsequent treatment notes not in the record at the time the state assessment was prepared.

## CONCLUSION

At bottom, Ms. Tumlin's RFC is the province of the ALJ and the ALJ's alone. Yet that decision must be supported by substantial medical evidence. And it is the ALJ's duty to develop the record and acquire that medical evidence. For the foregoing reasons, it is **ORDERED**:

1. The Report and Recommendation (Doc. 32) is **REJECTED**.

2. The decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g).

3. On remand, the Commissioner is instructed to reassess the nature of Plaintiff's mental health limitations, to reconsider the effect of Plaintiff's impairments in combination on her ability to work, to make specific findings regarding Plaintiff's alleged impairments of PTSD and agoraphobia, and to then apply those findings in reassessing Ms. Tumlin's residual functional capacity (RFC) relating to her mental health conditions and physical limitations.

4. The Clerk is directed to **ENTER JUDGMENT** in favor of Plaintiff and thereafter **CLOSE** the file.

**ORDERED** in Fort Myers, Florida, this 31st day of March 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE